Cleaners Guild of Chicago et al., Appellees, v. City of Chicago et al., Appellants.

Gen. No. 41,624.

104

Heard in the second division of this court for the first district at the December term, 1940. Opinion filed November 28, 1941.

BARNET HODES, Corporation Counsel, for appellants; MARTIN H. FOSS and ALPHONSE CERZA, Assistant Corporation Counsel, of counsel.

RYAN, CONDON & LIVINGSTON, of Chicago, for appellees; N. S. CHANNIN, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Cleaners Guild of Chicago, a nonprofit corporation, and seven individual plaintiffs engaged in the business of cleaning and dyeing, lodged a complaint against the City of Chicago, its commissioners of police and buildings, for temporary and permanent injunctive relief, seeking to restrain the city, its agents and serv-

ants from prosecuting any pending suits or proceedings against plaintiffs for alleged violations of certain zoning, health and fire prevention ordinances pertaining to the business of cleaning and dyeing in the City of Chicago; asking that the court find and declare that the process of dry cleaning by use of chlorinated hydrocarbon type solvents is not within the classification as a C-3 use under the zoning ordinance, but falls within classification C-1; also that the court find and declare that plaintiffs, other than the guild, are engaged in dry cleaning by means of chlorinated hydrocarbon type solvents; and that the provision of the building code which prohibits their systems being located in or near any dwelling or place of public assembly be declared invalid. The verified answer of defendants joined issue with the allegations of the complaint, and averred affirmatively and at length that the business of dyeing and cleaning as conducted by plaintiffs by means of chlorinated hydrocarbon solvents constitutes direct fire hazards and is highly hazardous to life and health because of the toxic gases emitted therefrom. The chancellor issued a temporary injunction, from which defendants have prosecuted this interlocutory appeal.

In view of the fact that the interlocutory order is predicated upon the complaint and answer it will be necessary for an understanding of the issues involved to set forth these pleadings at some length.

It is alleged that the *gravamen* of plaintiffs' suit is the oppressive, unreasonable, discriminatory and destructive effect on their business of a certain amendatory ordinance passed by the city council June 5, 1940, entitled, ''An amendment of the building and license regulations governing dry cleaning establishments.'' Plaintiffs say that they are engaged in the business of cleaning garments by a process employing synthetic solvents in specialized machinery and equipment, which are technically known as carbon tetrachloride,

trichlorethylene, perchlorethylene, and nonflammable blends of carbon tetrachloride and other chlorinated hydrocarbon solvents, which are among the group commonly referred to as the chlorinated hydrocarbon type of solvents, and that the process of cleaning with these solvents is commonly known as the synthetic process.

The complaint then proceeds to set forth that prior to nine or ten years ago the prevalent commercial method of dry cleaning garments was by the use of gasoline, naphtha, benzine or other volatile and highly flammable solvents, which are generally referred to as the naphtha process, as distinguished from the synthetic process; that the naphtha process has for many years been classified under chap. 51 of the Municipal Code of Chicago as a "hazardous use"; that under chap. 51-1 of the Municipal Code hazardous use units were required to comply with the general provisions of the code pertaining to buildings and in addition thereto with the special provisions of chap. 51; that under chap. 51-3 dry cleaning occupancy was classified as a hazardous use unit; that consistent with the fact that the naphtha process, because of its extreme flammability, is a hazardous use and involves a serious fire risk, naphtha cleaners for many years past have been under the regulation of chap. 121 of the Municipal Code, entitled, "Dry Cleaners and Spotters"; that under the latter chapter as it existed prior to the amendment of June 5, 1940, a dry cleaner was defined "to mean any person keeping or using more than two quarts of gasoline, naptha, benzine or other volatile flammable liquids for the purpose of dry cleaning or spotting wearing apparel or any fabric for profit or reward"; that this definition itself clearly denotes that the dry cleaning process as then known was synonymous with the use of highly flammable solvents, and their licensing was justified on the ground that municipalities have the power to prevent fires and to regulate the construction of buildings for the handling

and storage of flammable materials; that the zoning ordinance of 1923, by chap. 194-A-8, classified and restricted clothes cleaning as a C-3 use, and the gist of such restriction is that under the 1923 ordinance a dry cleaning establishment was not permitted in that part of a commercial district which is nearer at any point to a residence district or apartment district than 125 feet (chap. 194 of the Municipal Code of Chicago, A-10 (d) ), that a naphtha cleaning plant or unit, by the very nature of the process, requires complicated and bulky machinery and equipment, spacious quarters, and because of the fire hazard, special structural and housing facilities and restrictions, inherently involving a large capital outlay or investment, and to be profitable is designed for volume production in plant units adapted to servicing large residential areas as distinguished from a strictly neighborhood service use, and that these factors readily adapt the naphtha process to the C-3 use zoning classification without destroying its commercial effectiveness.

It is alleged that about ten years after the adoption of these zoning provisions the synthetic process of cleaning garments began its commercial development, and as a result of extensive research by chemical producers and equipment manufacturers in new and improved uses for chlorinated hydrocarbon solvents, the growth of the synthetic method of garment cleaning was substituted for the old naphtha process; that the growth of the new method is due first to the properties of the synthetic solvent itself, and second to the perfection of specialized machinery for its mechanical and safe use.

It is further alleged that these solvents present no fire hazard; that they have a relatively high volatility which permits rapid drying and deodorizing, and that the vapors have a distinctive odor and any appreciable escape out of the cleaning machinery is instantly detectable; that because of the ease with which syn-

thetic solvents can be reclaimed and used repeatedly, and freedom from fire hazard, they are particularly suitable for use in relatively small, compact, specialized machinery units to be accommodated in the average store space of the usual commercial district, in distinguishing contrast to the naphtha process, and that by reason of these characteristics garments are ready for delivery within as little as two hours after they are received, and therefore the synthetic process lends itself to a local service neighborhood use. It is conceded that these synthetic solvents have a moderate toxicity if improperly used, but because the odor from gases can be readily detected by the sense of smell, plaintiffs say they present a much lower toxicity hazard than carbon monoxide gas which is the odorless gas emitted from the exhaust of automobiles and other internal combustion engines which is in a certain degree continuously present in all congested city districts where there is heavy traffic.

It is alleged that the process of synthetic cleaning involves the use of specialized machinery and equipment which is designed to reduce to a minimum the possible escape of vapors into the surrounding room atmosphere to insure healthful working conditions and at the same time to conserve the solvent; that the price of these solvents per gallon is about 90c as compared with 9c per gallon for naphtha solvents, thus making conservation of the solvent essential to a commercially profitable use of the process. The complaint alleges that in the naphtha cleaning process there is involved a secondary step known as ''spotting,'' which is in effect the removal by hand and use of chemicals of types of soil which the principal process of cleaning fails to remove, and that a similar spotting process is involved but to a lesser degree in the synthetic process of cleaning; that in the spotting process flammable substances are sometimes used, but the synthetic cleaning business does not, in its nature, require, and is in

no sense dependent on flammable substances for spotting purposes. Plaintiffs allege that the synthetic cleaning process as a neighborhood enterprise has a large commercial value and that during the past six or seven years the number of such neighborhood synthetic cleaning stores and installations has grown from only a few to about 150, located in various parts of the city, including the loop area as well as outlying districts which are generally classified under the zoning ordinance of the City of Chicago as commercial districts; and that the respective synthetic cleaning stores operated by plaintiffs are located in commercial districts in various sections of the city.

The complaint then sets forth the pertinent sections of the code as existing prior to the amendment and the amendatory portions thereof, and alleges that prior to the amendatory ordinance of June 5, 1940, regulation and licensing of cleaners was predicated on the use of gasoline, naphtha, benzine or other volatile flammable oils, the use of which involves a serious fire hazard and therefore is subject to municipal regulation under the implied powers of chapter 24, sections 65.62 and 65.64 of the Cities and Villages Act (Smith-Hurd Rev. Stat. 1939).

It is further alleged that by the amendment of June 5, 1940, the city council included chlorinated hydrocarbon type solvents within the regulatory scope of both chapter 51 of the Municipal Code, entitled "Hazardous Use Units," and chap. 121 of the code, entitled "Dry Cleaners and Spotters"; that these synthetic solvents present no fire hazard and therefore their inclusion cannot be justified on the ground of fire hazard, but must be based on some other implied ground, and that since these synthetic solvents, if improperly used, have some toxic reactions, "it is a safe assumption that the city's justification for the regulation of their use is based on health hazard from toxic vapors."

The complaint alleges that fire hazard on the one hand and health hazard on the other are so different in their reactions that restrictions by the city within the ordinances complained of, consistent with protection of the public from fire, are entirely unreasonable and irrelevant to the protection of the public health from toxicity, and, in fact, destructive of the synthetic cleaning business, and that the substance of plaintiffs' objections is "that under the guise of regulation of synthetic cleaners, the City is attempting to subject these plaintiffs to certain regulatory provisions of the ordinances which have no reasonable relation to the protection of the public health and are so oppressive, unreasonable and discriminatory when applied to their type of business as to, in effect, prohibit and destroy their business within the City of Chicago."

With respect to the zoning of cleaning and dyeing establishments, it is alleged that under chap. 194 A-8, custom dyeing or cleaning is classified as a C-3 use, and that the ordinance provides that "no C-3 use or part thereof, together with auxiliary uses thereto, shall be established in that part of a commercial district which is nearer at any point to a residence district or apartment district than 125 feet." It is alleged that when the zoning ordinance was passed in 1923 the synthetic cleaning industry was entirely unknown, and that the only method then used was the naphtha process, which was generally recognized as a very extreme fire hazard; that the naphtha process requires complicated and bulky machinery and equipment, and, because of fire hazard, special structural and housing facilities, and to be commercially profitable is dependent on volume of production adapted to servicing large residential areas as distinguished from a strictly neighborhood service use; and that it is to be assumed that in 1923, when the C-3 classification for dry cleaners was established, it was done

with a view to the nature of the cleaning industry as then known, and the restriction that dry cleaning plants shall not be established in that part of a commercial district which is nearer at any point to a residence district or apartment district than 125 feet, is consistent with the cleaning industry as it was known and conducted in the year 1923, but that the factors that justified these restrictions in 1923 are wholly non-existent in the case of the later synthetic process of cleaning in which plaintiffs are engaged.

The complaint alleges generally that each plaintiff conducts his business in a safe, sound and sanitary manner, free from any hazards of toxicity to the employees and public and consistent with the protection of health and safety; that each plaintiff has built up a local neighborhood good will and clientele indispensable to a continuance in the lawful business of synthetic cleaning; and that their businesses, in the aggregate, represent an investment of many thousands of dollars.

It appears from the complaint that after the passage of the amendatory ordinance of June 5, 1940, some of the plaintiffs were served with arrest slips by the City of Chicago for purported violation of the ordinances, others threatened with arrest, some served with summary notices to discontinue the operation of their businesses within five days for alleged violation of the provisions of the ordinances, and still others threatened with the service on them of summary notices to discontinue their businesses; and that unless the City of Chicago, its officers and agents are restrained from pressing these proceedings, both threatened and commenced against them, their businesses, investment, patronage and good will will be destroyed and irreparably lost to them; and that, having no adequate remedy at law, and for the purpose of preventing a multiplicity of suits, they bring their complaint to obtain injunctive relief.

The verified answer of the city and other defendants denies that the ordinances have an oppressive, unreasonable, discriminatory and destructive effect upon the lawful business of plaintiffs, it states that chlorinated hydrocarbon solvents are not the only cleaning solvents used by plaintiffs, but that in addition thereto plaintiffs use highly flammable solvents, such as naphtha, gasoline, acetone and the like, which constitute serious fire hazards; that although chlorinated hydrocarbon solvents do not constitute the same direct fire hazard as do gasoline, naphtha, benzine and other flammable liquids, they are highly hazardous to life and health, due to the toxic gases emitted therefrom, and, because of the hazards involved in the storage and use of same, they have been classified as a hazardous use, and dry cleaning buildings and rooms in which they are used are required to comply with the provisions of the Municipal Code relating to hazardous use units; that because of the hazards involved in their use, dry cleaners have been brought within and made subject to the city's dry cleaners and spotters license ordinance.

The answer further avers that chlorinated hydrocarbon solvents are highly volatile liquids and constitute secondary fire hazards, for the reason that if a fire or other accident should occur in a plant using them, and a pipe, drum or other container holding them were to be ruptured, then by reason of the highly toxic nature of the fumes from such solvents they would constitute pronounced hazards by causing the death of or incapacitation of firemen or others in or near the plant.

It is averred that the licensing and regulation of all dry cleaners is now justified on the ground that municipalities have the power to prevent fires and regulate the construction of buildings for the handling and storage of flammable liquids and also the power to protect lives and health of the public against the haz-

ards of toxic liquids and gases and to regulate the construction of buildings, including the ventilation thereof, for the storage and use of toxic chlorinated hydrocarbon solvents.

It is averred that the city's zoning ordinance classifies custom dyeing or cleaning, clothes cleaning, steam cleaning, as a C-3 use along with many other C-3 uses, and prohibits the establishment of C-3 uses in that part of a commercial district which is nearer than 125 feet to a residence district or apartment district; that long before the passage of the zoning ordinance in 1923 the city regulated fire hazards, and the zoning ordinance was not passed for the purpose of regulating fire hazards but basically and fundamentally for reasons such as the planned dividing of the City of Chicago into districts, for the purpose of regulating the location of trades and industries and buildings and structures designed for dwellings, apartment houses, industries and other specific uses, and generally for the underlying purpose of protecting residence districts and apartment districts against commercial and manufacturing establishments, whether the latter were or were not fire hazards, and for the purpose of preventing depreciation in property values.

The answer further avers that chlorinated hydrocarbon process cleaning requires the use of complicated and costly machinery and equipment, special structural housing facilities and restrictions and careful regulation by public authorities for the purpose of protecting the employees and the public against the toxic vapors and fumes of the solvents; that if the structural and housing facilities of dry cleaning plants using such solvents are not properly regulated and adequate ventilation provided, and the location of exhaust pipes kept from residential apartments and places of public assembly, a dire health hazard will be presented; and that these health hazards as readily adapt chlorinated hydrocarbon cleaning to the C-3 use

zoning classification as do the fire and explosion factors adapt the naptha process to such C-3 use zoning classification.

The answer denies that chlorinated hydrocarbon solvents have a distinctive odor and that any appreciable escape is instantly detected, but state that the odor is very subtle and at times pleasant to the sense of smell, and under certain conditions and concentrations it is well nigh impossible to detect; and that there is always some vapor escape from the cleaning machinery and equipment in the process of dry cleaning.

It is further averred that dry cleaners of long experience say it is impossible to clean all garments and fabrics by using chlorinated hydrocarbon solvents, but that other solvents, flammable in their nature, such as naphtha, ether and the like must be resorted to.

Defendants aver that the reclamation process employed by plaintiffs in order to make repeated use of the solvents is a distillation process; that to distill it is necessary to subject to high temperatures, to cause the solvents to vaporize and in this manner remove therefrom any soil or foreign substance; that the vapors are then passed through cooling apparatus to recondense the liquids, but after recondensation it becomes necessary to remove both liquid and foreign matter from the still; that this distillation process not only subjects the machinery and equipment to high tension, causing possible leaks therein, but contamination results when the foreign substances are removed and exposed to the atmosphere of the rooms in the cleaning establishments, and is frequently the direct cause of fires and explosions; that the solvents which plaintiffs say they use in their business are produced by combining hydrocarbons with gas known as chlorene in various proportions, and at ordinary room temperatures they have a vapor pressure which will cause them to diffuse into an enclosed room and reach such concentrations as to prove fatal; that they are

highly volatile, and emit gases more readily at room temperature than do the so-called naphtha solvents, and exposure to them may easily endanger health to a degree that would bring about degenerative changes in the human system; that this degenerative action is well recognized by both the medical profession and all industries wherein these solvents are manufactured and used; that because of their volatile nature they are a health hazard to persons occupying inclosed spaces within the plant building used, and frequently to individuals in adjoining buildings, and are additionally dangerous when used near heated surfaces, because they break down to form phosgene under certain conditions and to form hydrochloric acid and oxide of chlorine under other conditions; that phosgene is highly toxic and one of the principal agents in chemical warfare.

It is averred that the regulation of these solvents is of paramount importance to protect the lives and health of employees, and the public generally, because the membrane of the alveolae of the lungs is pervious to them; they enter the blood stream and have the same effect on the fatty structures of the body as they have in the dry cleaning process, namely, a fat solvent; that since one of the substances in the blood is the protoplasm consisting in part of fatty material, the danger is apparent; and that they also have an injurious external effect, causing dermatitis and chronic eczema.

It is also averred that the business of "spotting" is involved in most all dry cleaning establishments, whether synthetic or naphtha, and that the defendants are informed and believe that practically all dry cleaners in the spotting process are dependent upon a wide variety of flammable and toxic substances, such as ether, gasoline, naphtha, acetone, carbon disulphide and the like; that the regulation of dry cleaning under the hazardous use unit chapter of the municipal code is

justified not only on the ground of fire hazard but also and especially upon the ground of hazards due to toxic gases, and that the ordinance regulations have a reasonable and direct relationship to the public health and public welfare.

With reference to the zoning ordinance it is averred that this ordinance was passed pursuant to express statutory authority and has long been in effect and sustained by the courts as being an exercise by the city of the broad powers as to zoning granted by the legislature; that its classifications are valid, and the courts should not substitute their judgment for that of the legislative body; that the classification of dry cleaners as a C-3 use, and the 125 foot restriction, are equally applicable, reasonable and proper and within the power of the city to apply to synthetic process cleaners.

It is averred that plaintiffs, comprising a small group of recalcitrant synthetic cleaners object to the ordinance, while others are complying therewith and recognizing the value and validity thereof; they deny that there are no locations in commercial districts more than 125 feet distant from residence or apartment districts, but on the contrary say that there are vast areas wherein plaintiffs and their establishments may properly be located.

In conclusion it is averred that manufacturers of chlorinated hydrocarbon solvents recognize the toxic properties thereof by placing conspicuous labels on all containers or drums containing such solvents, warning users against their toxic properties, and that the United States Division of Labor Standards recognizes the hazards in chlorinated solvents and maintains a large force for research purposes and for the purpose of preparing and disseminating information regarding the toxic properties and the causes and prevention of poisoning thereby. Plaintiffs' allegation that their businesses will be injuriously affected by the

enforcement of the ordinance is generally denied in the answer.

It may be conceded that the object of a temporary injunction is to preserve and hold in *status quo* the rights of parties until the cause can be disposed of on its merits (*Nestor Johnson Mfg. Co. v. Goldblatt,* 371 Ill. 570), and that the purpose of the statute (Ill. Rev. Stat. 1939, ch. 110, sec. 202 [Jones Ill. Stats. Ann. 104.078]), allowing appeals from interlocutory orders is to permit a review of the exercise of the discretion lodged in the chancellor for the purpose of determining whether an interlocutory order is necessary to maintain the *status quo* and preserve the equitable rights of the parties (*Lincoln Trust & Savings Bank v. Nelson,* 261 Ill. App. 370), but whether equity will lend its aid, either in the form of a temporary or permanent injunction, to violate valid ordinances, predicated on the admitted right of the city to enforce health and safety measures, especially when it appears extremely doubtful whether plaintiffs can ultimately prevail, presents another question.

Plaintiffs concede that the ordinances in question were valid when passed, and that the city had the power and authority to enact them. They contend, however, that these ordinances are outmoded as now invoked against them because of the new synthetic process of cleaning developed since the ordinances were passed; that because chlorinated hydrocarbon solvents, in the main, are not flammable or direct fire hazards and are used in specialized cleaning equipment, plaintiffs should be permitted to locate their cleaning plants wherever they choose, in or near dwellings, apartments or places of public assembly, where plaintiffs can most readily attract prospective customers; and that they should be permitted to escape compliance with the city's ordinances which control the location of dry cleaning plants and regulate the business of dry cleaning, and receive the aid of equity.

in so doing, upon the theory that it is the province
of the courts and not the city council to grant relief
against unreasonable and oppressive ordinances and
to protect litigants from arbitrary or discriminatory
restraint by the city in the exercise of its police power.
The argument invoked is predicated upon allegations
that these ordinances are oppressive, unreasonable,
discriminatory, and that they have a destructive effect
upon the business of plaintiffs.

Plaintiffs admit that the chlorinated hydrocarbon
solvents used in their plants are volatile at room tem-
peratures and toxic, and it is conceded in their com-
plaint, and affirmatively averred in defendants'
answer, that certain flammable chemicals are used in
spot cleaning as a part of the business in which they
are engaged. The city argues that the most plaintiffs
can hope to accomplish on the final hearing is to show
that their toxic solvents are less dangerous to health
than defendants believe them to be, that their special-
ized machinery and equipment is better adapted to
protect employees and the public from the hazards of
fires and toxic gases than defendants aver in their
answer, and that plaintiffs consider the 125 foot re-
strictive provision of the zoning ordinances and of
the hazardous use units chapter of the building code
more drastic than plaintiffs think they should be, be-
cause of the new processes of cleaning now employed.

The powers to subject to license and regulate dry
cleaners using toxic solvents are derived from various
sections of Article V of the Cities & Villages Act
(chap. 24, Ill. Rev. Stat. 1939). Section 78 (par.
65.77) grants express power to make all regulations
necessary or expedient for the promotion of health or
the suppression of disease, and in interpreting this
section of the statute the courts have said that the
health power is one of the most important of the city's
police powers, and that it is "inherent in a municipal-
ity, and may be exercised whether expressly granted

or not, because the preservation of the health of the public is indispensable to the existence of the municipal corporations." (*Gundling v. City of Chicago,* 176 Ill. 340, at 348, citing *Ferguson v. City of Selma,* 43 Ala. 400.) In *Biffer v. City of Chicago,* 278 Ill. 562, without any specific grant of power the court, under section 78, sustained the city's ordinance regulating the sale and advertising for sale of deadly weapons, and said (p. 569) : "When the city council considers some occupation or thing dangerous to the health of the community and in the exercise of its discretion passes an ordinance to prevent such a danger, it is. the policy of the law to favor such legislation. Municipalities are allowed a greater degree of liberty of legislation in this direction than in any other. . . . The most important of the police powers is that of caring for the safety and health of the community. . . ."

In *Ruban v. City of Chicago,* 330 Ill. 97, the court held (at p. 101) that "if there is a reasonable connection between any business or occupation and peril of employment therein, or to the public, a reasonable ground for regulation is presented." The *Ruban* case involved the regulation of the laundry business, which the court described as being of such character, which without proper regulation, "may create unsanitary and unhealthful conditions," and concluded by saying "there seems to be no doubt that the city had authority, under paragraphs 66 and 78, to regulate the establishment and operation of laundries . . . ."

It is one of plaintiffs' contentions that there is no need for regulation of their plants and businesses; that the city's power is limited to the regulation of health hazards and does not extend to regulating the use of every toxic and injurious substance; that because their toxic solvents are used by them in specialized machinery and equipment, there is no health hazard in their use. It seems to us, however, that the

affirmative averments of the answer, which in the absence of a replication to the verified answer must be taken as admitted (*Wiedoeft v. Frank Holton & Co.*, 294 Ill. App. 118, 126), satisfactorily negative the allegations of the complaint. Aside from this conclusion, however, the decisions sustain the position taken by the city. *City of Chicago v. Arbuckle Bros.*, 344 Ill. 597, involved the city's wholesale food establishments' ordinance, to which defendants objected on the ground that due to the kind and manner of handling their food products the ordinance regulations were not necessary, a contention similar to that advanced by plaintiffs in this proceeding. The court held adversely to this contention, however, and said (p. 604): "It is argued on behalf of the plaintiff in error that if there is any question of public health connected with the distribution of the articles dealt in by it the question is very remote; that most of the operations involved in the preparation of its products are accomplished through the use of automatic machinery; and furthermore, that teas and coffees, before consumption, are prepared with boiling water in the home and spices and flavoring extracts are used sparingly in cooking. However remote the question may be, whether it exists and the degree of its importance are for the determination of the city council, and while its determination is not final, it will not be set aside if there is any reasonable relation between the action of the council and the public health." *Ruban v. City of Chicago, supra,* deals with the same subject matter and the court there held (p. 101): "The city in the first instance, is the judge of the expediency of regulation," and that "having adopted means and prescribed methods to those ends, the city has the right, and as a correlative the duty is imposed upon it, to make, correct and enforce the regulations it has prescribed to that end." It is likewise well settled in Illinois that when a city exercises its power of regula-

tion upon a subject courts will not declare the regulatory provisions void unless they are palpably arbitrary (*City of Chicago v. R. & X. Restaurant,* 369 Ill. 65, 71); and that courts are without power to inquire into the wisdom of an ordinance and have nothing to do with the mere policy of legislation. (*Booth v. Illinois,* 184 U. S. 425; *City of Chicago v. Waters,* 363 Ill. 125, 131; *Stearns v. City of Chicago,* 368 Ill. 112, 116.)

It is evident from an examination of the complaint and the averments of the answer that under the well-settled rule of law in this State it did not lie within the province of the court to declare these ordinances manifestly unreasonable or palpably arbitrary, especially in view of the conceded admissions of the complaint, and while there may be room for a difference of opinion on the question of fire hazard and toxicity, we are impelled to hold that the ordinances are adapted to the purpose of securing and protecting the public health and safety, a duty committed by the legislature to the city, whose judgment and discretion is vested in the city council and not the courts.

With respect to the zoning ordinance as applicable to plaintiffs' dry cleaning plants, we think the provisions of this ordinance are valid and properly related to the dry cleaners and spotters' license ordinance, which provides that every application for a license shall be approved by the commissioner of buildings and the division marshal in charge of the bureau of fire prevention as to compliance of the premises named therein with the building provisions and fire regulations of the code, before the licenses issue. Thus, the provisions of the city's zoning ordinance, as well as those of the hazardous use units, are incorporated in the license ordinance. With respect to dry cleaners the requirements of the zoning ordinance are proper for the reason that their plants are commercial establishments and are regulated as to location. Dry cleaners have long been subject to the provisions of this

ordinance. The legislature has granted the city broad powers over zoning and the ordinance was not passed merely to regulate fire hazards but for various reasons specified in the grant of power. The powers granted to the city are reasonable and valid, and the authority of a municipality to impose reasonable restraint upon the use of private property by means of zoning ordinances has been repeatedly recognized by the Supreme Court of this State, and was expressly approved in *Speroni v. Board of Appeals of the City of Sterling*, 368 Ill. 568. If, as plaintiffs contend, the process of dry cleaning should not be within the zoning ordinance as a C-3 use, that contention should be addressed to the city council, and not to the courts, and unless the chancellor was prepared to hold that the classification was palpably arbitrary or that there was no basis or reason to support it, or that the ordinance should be impeached for fraud, we think he was not justified in questioning the classification enacted by the city.

With respect to the particular ordinance before its amendment June 5, 1940, the Supreme Court in *Klever Shampay Karpet Kleaners v. City of Chicago*, 323 Ill. 368, made the following observation (p. 375): "If the requirements of an ordinance regulating the construction and use of buildings for the protection of the lives and safety of citizens as well as their property against fire are adapted to the purpose of securing such protection, the court cannot interfere with their enforcement unless they are manifestly unreasonable. The extent to which the public safety requires the construction of buildings and the conduct of business therein to be regulated and the method of such regulation, where such regulation is committed by the legislature to a city, are questions which are left to the judgment and discretion of the city council to determine, and unless the exercise of such judgment and discretion is manifestly unreasonable the courts will not interfere with it. *A court will not hold an ordinance*

*void as unreasonable where there is room for a fair difference of opinion on the question, even though the correctness of the legislative judgment may be doubtful and the court may regard the ordinance as not the best which might be adopted for the purpose."*

Following the issuance of the temporary injunction the cause was referred generally to a master in chancery for hearing of the issues made up by the pleadings, with a short time limitation upon the conclusion of the hearing which has long since expired, and presumably the proceedings should now be ready for determination upon the merits of the cause. Plaintiffs' counsel argue that reassertion of the allegations of the bill and answer does not constitute proof of those allegations, but that for a determination of these ultimate questions the chancellor properly referred the cause to the master and was justified, in the interim, in granting the temporary injunction to maintain the *status quo* pending the hearing on the merits. This procedure is not applicable to cases where ordinances involved were admittedly valid when passed and within the powers of the city to enact, and the case made by the bill and answer fails to disclose that the application and enforcement of the ordinances and their reasonable adaption to the subject matter of the regulatory power are palpably arbitrary or manifestly unreasonable.

Plaintiffs complain because the city has only recently determined to enforce these ordinances against them and that the summary manner in which it is proposed now to enforce them will operate with destructive effect upon the businesses of plaintiffs. They overlook the fact, however, that these ordinances were in effect long before they selected the present locations in which they are operating their cleaning and dyeing establishments, and that plaintiffs were fully aware of the existence of these ordinances at all times. It has been repeatedly held that failure to enforce an ordinance

against all persons affected by it does not invalidate it or furnish a ground of attack against it. (*Patsone v. Pennsylvania*, 232 U. S. 138; *Wagner v. City of Rock Island*, 146 Ill. 139; *City of Metropolis v. Gibbons*, 334 Ill. 431.)

It appears from the complaint that chlorinated hydrocarbon cleaning is a comparatively new process and has made rapid growth in the city, and until the amendment of June 5, 1940, subjecting such establishments to regulation and license under the dry cleaners and spotters ordinance, it was undoubtedly difficult for the zoning officials to check up on the many plants in operation. On the other hand, the zoning ordinance classification and the 125 foot provision have long been applicable to plaintiffs' establishments, and even though a violation of this ordinance was not sooner abated plaintiffs should not be entitled to urge their own violation of a law as a reason why it should not be enforced against them. Moreover, the answer affirmatively shows, and the complaint concedes, that plaintiffs keep and use in their business highly flammable solvents such as ether, naptha and the like, which are fire hazards, and therefore their plants come within the purview of the ordinance as upheld in *Klever Shampay Karpet Kleaners v. City of Chicago, supra.*

No question is raised as to the constitutionality of these ordinances, and under the authorities we hold them to bear a reasonable relation to the public health and safety. We are of the opinion that the temporary injunction was improvidently issued and should be reversed. It is so ordered.

*Injunction order reversed.*

SCANLAN, P. J., and SULLIVAN, J., concur.