Chicago Motor Coach Company, Appellee, v. Ralph Budd et al., and Chicago Transit Authority, Appellants.

Gen. No. 45,657.

Opinion filed March 25, 1952. Rehearing denied April 22, 1952. Released for publication April 23, 1952.

THOMAS C. STRACHAN, JR., NASH, AHERN & MCNALLY, and JAMES E. HASTINGS, all of Chicago, for appellants.

ALBERT E. JENNER, JR., LEE A. FREEMAN, J. GORDON HENRY, and PHILIP W. TONE, all of Chicago, for appellees; ROOKS & FREEMAN, and JOHNSTON, THOMPSON, RAYMOND & MAYER, all of Chicago, of counsel.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from an order granting a temporary injunction restraining defendants from extending their motorbus service on Austin boulevard from North avenue to Roosevelt road. The west half of

Austin boulevard is in Oak Park, the east half in Chicago. Complaint was filed May 25, 1951 and on that date plaintiff applied for a temporary injunction. On August 2, 1951 the court granted plaintiff's application. In the interim briefs had been submitted by the parties on the legal issues, the testimony of witnesses and other evidence presented, and extensive oral arguments heard. The transcript consists of more than 800 pages. The court granted the temporary injunction on the tentative basis that the issues both of law and fact should be reserved for final hearing and the status quo be maintained.

The first question for us to consider is whether defendants were entitled to a decision of the court on the issues argued and the facts developed during the hearing. We are of the opinion that they were. It is true, the cases are in general agreement that the purpose of a temporary injunction is to maintain the status quo until final hearing on the merits. *People ex rel. The Chicago Bar Association v. Standidge,* 333 Ill. 361; *Biehn v. Tess,* 340 Ill. App. 140; *Lincoln Trust and Savings Bank v. Nelson,* 261 Ill. App. 370; *Friedman v. Peckler,* 255 Ill. App. 199; *Nestor Johnson Mfg. Co. v. Goldblatt,* 371 Ill. 570. Even so, the court should consider the nature of the status quo which is to be preserved. If it is of static character, such as a joint savings account or fixed securities, the preservation of which cannot harm defendant, or if the substance of the litigation is a physical object which defendant may destroy if an injunction is not immediately issued, the courts may exercise a greater discretion. This status quo enabled plaintiff to maintain its exclusive service on Austin boulevard and denied defendants the right to operate their service. Thus, for the time being plaintiff was collecting revenue it would not have received had it been in competition with defendants, and defendants, if they are correct

in their assertions, were losing whatever advantages they might have had. But aside from a distinction which might be made between this and other cases with respect to the character of the status quo, the granting of a temporary injunction is not automatic. A showing must be made that there is a probability of ultimate success. *Mayer v. Collins*, 263 Ill. App. 219; *Babcock v. Chicago Railways Co.*, 236 Ill. App. 360. In determining this probability a distinction should be made between issues of law and issues of fact. Where the issue of law is difficult and the court needs to be advised thereon, or where it is dependent upon the ascertainment of facts in issue and the need for the preservation of the status quo is urgent, the court would be warranted in issuing a temporary injunction without waiting to be fully advised on the law. It is recognized, however, that in such instances the purpose of the injunction is to preserve the substance of the litigation from destruction until the court has had an opportunity to be advised. In some jurisdictions, provision is made for a restraining order until such time as the court can inform itself more fully before issuing a temporary injunction. We have no such provision in our courts, but the agreement between the parties to maintain the status quo had the same effect and served the same purpose.

██ Under the circumstances, the court should have reached some conclusion on the issues presented, and we will examine them in order to ascertain the probability of plaintiff's right to relief. *Biehn v. Tess*, 340 Ill. App. 140; *Cleaners Guild of Chicago v. City of Chicago*, 312 Ill. App. 102; *Koelling v. Foster*, 150 Ill. App. 130; *Peoples Gas Light & Coke Co. v. Cook Lumber Terminal Co.*, 256 Ill. App. 357, 371. In the case last cited, the court quoted from High on Injunctions, sec. 1696, p. 1645, to the effect that the discretion of a chancellor will be reviewed on appeal insofar as he has failed to apply the law.

The point urged and most assiduously advanced by plaintiff is that this service is "necessarily local transportation" and is therefore unauthorized because Chicago Transit Authority has failed to obtain either authorization of the Board of Trustees of the Village of Oak Park or a referendum approval of the inhabitants of the village, as expressly required by section 11 of the Metropolitan Transit Authority Act. The Chicago Transit Authority was created by the Metropolitan Transit Authority Act, April 12, 1945 (Ill. Rev. Stat. 1949, ch. 111 2/3, sec. 301 et seq.) [Jones Ill. Stats. Ann. 21.2064(1)]. The object as stated in the title was to create a municipal corporation for public ownership and operation of the transportation system in the metropolitan area of Cook county. To that purpose it was authorized to acquire, construct, operate and maintain such a transportation system and was given all powers necessary or convenient to accomplish the purposes of the Act; to make rules and regulations governing the operation of the system; to determine routings; to pass all ordinances regulating the use, operation and maintenance of its facilities; and to carry into effect the powers granted to that Authority. Section 11 provides that the Authority should have the right to use any public road, street, or other public way in the metropolitan area of Cook county for interurban transportation of passengers. Specifically excluded, however, was the right to use any street or other public way in any city, village or incorporated town for local transportation of passengers within any such municipality "unless and until authorized so to do by an ordinance . . . ."

██ In *Lustfield v. Chicago Transit Authority*, 408 Ill. 404, 413, the court said:

"We cannot imagine stronger language to convey to the Transit Authority full power to conduct the business of managing, regulating and operating a

transportation system in the municipal area of Chicago.''

It is obvious that what was contemplated by the Act was a transportation system which would provide local transportation for the City of Chicago and which would also operate between the city and suburbs surrounding it. Pursuant to this Act the Chicago Transit Authority acquired the properties of the elevated roads, surface lines and subways operating within the City of Chicago and between the city and adjacent suburbs. On April 23, 1945, it obtained an ordinance from the City Council of the City of Chicago, granting it permission to operate a transportation system within the city. One of the lines it operates within the city runs on Austin avenue from the northern city limits at Milwaukee and Nagle avenues, south six to seven miles to the northern boundary of the Village of Oak Park at Austin and North avenues. At this point Austin avenue becomes Austin boulevard and extends three miles south to Roosevelt road. The west half of Austin boulevard is within the Village of Oak Park and the east half is within the City of Chicago. North avenue is the northern boundary of Oak Park and Roosevelt road is the southern. The extension proposed would extend the Austin avenue line from North avenue to Roosevelt road. The purpose of the extension, as stated by defendants, is to provide a direct service from the far northwest side of Chicago connecting with the main east and west lines of the Chicago Transit Authority to and from the business districts of Chicago. At the present time the riding public has to disembark from buses at North avenue, transfer to plaintiff's buses and disembark again to transfer to east and west lines of the Chicago Transit Authority. It is also contended by defendants that the extension was designed to round out the gridiron pattern on which their transportation system is based. Thus,

passengers from the northwest side of Chicago would leave the city limits at North avenue and Austin boulevard, ride through Oak Park for a distance of three miles, take one of defendants' lines entering the City of Chicago and go to their destination, whatever that might be, either the loop or some other portion of the city or its adjoining suburbs, all of which are served by the Chicago Transit Authority. Other passengers living in Oak Park can use the service for the purpose of riding from Oak Park to the City of Chicago. Still other passengers would use this extension for transportation between points within the village, that is to say, local transportation. It the proposed extension, therefore, interurban or local transportation?

██ The situation is unique and there is perhaps nothing of comparable nature in any great metropolitan area of the world. There are some earlier cases in which the distinction between interurban and street railway service was considered to be that of the difference between the ordinary commercial railroad and the street railways which operate entirely within a town or city. *City of Spring Valley v. Chicago, Ottawa & Peoria Ry. Co.*, 277 Ill. 313; *City of Aurora v. Elgin, A. & S. Traction Co.*, 227 Ill. 485. Those cases, except to demonstrate that there is no fixed definition of what is "interurban," have no value for us. In the case of *Lustfield v. Chicago Transit Authority*, 408 Ill. 404, the court had occasion to pass on an issue similar in some aspects to that now before this court. The facts in that case were these: After Chicago Transit Authority acquired the properties of the Metropolitan West Side Elevated Railway Company, it suspended all week-end service west of Cicero avenue on the Douglas Park line (an elevated line operating within the city and to western suburbs) and substituted shuttle bus service. Suspension of week-end elevated service was in violation of conditions contained in the operating franchises

granted to the private predecessor company by the City of Berwyn and Town of Cicero, through which the Douglas Park line ran. These municipalities sought to enjoin the Authority. The questions presented for decision were whether or not Chicago Transit Authority was bound by ordinances of Berwyn and Cicero, and whether or not it was required to obtain consent of the municipalities before it could maintain bus service. The services involved were mainly interurban, but it is certain that part of these services was purely local, that is, carriers picked up and discharged passengers within the limits of one town. In its opinion the court undertook to summarize the important points made by the parties and at p. 409 said:

"Lastly, the appellee says that the cities do not have the power to prohibit busses from using the public highways, and states that the bus service is, in fact, interurban rather than local and is expressly authorized by the Metropolitan Transit Authority Act. Counsel cite *People v. Chicago Transit Authority*, 392 Ill. 77, and section 31 of the act aforesaid."

In other words, it was there argued that even though some local transportation was involved in this operation, it was generally interurban and was expressly authorized by the Metropolitan Transit Authority Act. While the court did not specifically touch on this point, its decision in effect sustained it. The broad purpose ascribed to the Act by the court notably strengthens this view:

"It is our understanding that the Act was designed to provide a transportation system for the largest metropolitan area in the state. To hold that individual communities could prevent the Authority from operating within its statutory borders would greatly weaken this intent and make it impossible for the Transit Authority to accomplish the purpose for which it was designed." (P. 415.)

A reasonable interpretation of the language of the Act sustains this view. In section 11 interurban transportation and local transportation within a municipality are contrasting terms. Since interurban involves two municipalities, the other phrase must have reference to a service confined exclusively to one. Despite the fact that some passengers will board and leave buses entirely within Oak Park, that fact is ancillary to the scheme of the service, which is to carry Chicago passengers from the northwest area into Oak Park and thence to Chicago Transit Authority's connecting elevated and bus lines. To permit the existence of a small ''local'' transportation system to become an obstacle to development of the Authority's broad transit plan would be to disregard the purpose of the Transit Act.

Even if the proposed service were local transportation within the meaning of section 11, consent of Oak Park was not required because at the time the injunctive order was issued, Oak Park did not have jurisdiction over any part of Austin boulevard. It had many years before transferred that jurisdiction to the Park District. The language of the statutes and ordinances involved in this transfer of jurisdiction leaves no question that thereafter Oak Park's consent to transit service was not required. The consent of the Park District was not necessary under section 7 of the Chicago Park District Act (Ill. Rev. Stat. 1951, ch. 105, sec. 333.7) [Jones Ill. Stats. Ann. 96.557]. An Act was passed, however, by the Illinois General Assembly in June, 1951, authorizing the village to reacquire jurisdiction of the west half of Austin boulevard upon ordinance duly passed and submitted to a referendum. On September 5, 1951, the Board passed such ordinance. It was submitted to a referendum and jurisdiction under the law was reacquired by the village on October 19, 1951, that is, assuming the legality of this procedure,

which we have not at this time considered. The Village of Oak Park filed an intervening petition July 23, 1951, setting forth passage of the Act and the prospective reacquisition of jurisdiction by the village. Since the lower court was aware of the probability that this action would be taken, should it have permitted such knowledge to influence its decision, that is, should it have considered itself on notice that Oak Park might recontrol Austin boulevard?

██ ██ The validity of the injunction order must be considered on facts as they existed as of the time the order was entered. *Bauer v. Lindgren,* 279 Ill. App. 397, 406. *Cohen v. Sparberg,* 316 Ill. App. 140; *Balaban & Katz Corporation v. Rose,* 283 Ill. App. 615; *Goldblatt Bros. Inc. v. Sixty-third & Halsted Realty Co.,* 338 Ill. App. 543, 548. Although the cases cited do not present the exact situation found here, they support the proposition that an interlocutory order should be judged as of the time it was entered, especially where there was no complete assurance that the contemplated action would ever become a reality. The Oak Park ordinance of reacquisition was passed by a four to three vote of the village trustees.

██ ██ Plaintiff argues that the proposed service would violate the express requirements of the Metropolitan Transit Authority Act and the ordinance of the City of Chicago granting a franchise, both of which, it says, require that new service installed by the Chicago Transit Authority should serve the public convenience and necessity. The presumptions are in favor of the validity of the Chicago Transit Authority ordinance, and the case for invalidity on the ground that such an ordinance may be unreasonable and arbitrary must be clear and convincing. *Zadworny v. City of Chicago,* 380 Ill. 470; *City of West Frankfort v. Industrial Commission,* 406 Ill. 452. The Chicago Transit Authority asserts its purposes in instituting the Austin

boulevard service are to provide northwest side passengers with a direct connection to its east-west lines running into the loop; to relieve congested traffic on Central avenue; and to implement further its modernization program and gridiron scheme of transportation. Plaintiff relies, not so much on a denial of these facts, but rather on other facts, such as the existent bus service on Austin boulevard being adequate; excessive operating costs for both parties as a result; and congested traffic on Austin boulevard. The reasons supporting the ordinance are by no means frivolous. At best, plaintiff has raised a debatable question. There can be no doubt that a portion of the public will be benefited. The only question is to what extent. Under such circumstances, the ordinance must be upheld.

 Plaintiff also contends that operating under a certificate of convenience from the Illinois Commerce Commission and being first in the field, it has the right to the exclusive use of Austin boulevard for that purpose. We feel that whatever merit there may be in this point outside the metropolitan area of Cook county, within that area the public policy as set forth in the Metropolitan Transit Authority Act must be reconciled with policies heretofore stated, and examined in that light the ordinance is valid.

 Plaintiff presents many questions that have to do with the practical operation of the lines, such as duplication of transportation, diversion of buses and facilities, the prospect of increase in fares, traffic congestion, and disadvantages to patrons of the Chicago Transit Authority. It is also alleged that the Chicago Transit Board was animated by a vindictive spirit against plaintiff. No showing is made that the Board had any other motive than to serve the ultimate best interests of the Chicago Transit Authority. It is revealed that there is and has been keen competition between these two public utilities. Such charges as these

must yield to the strong presumption in favor of the validity of the ordinance and of the honest execution of their powers by the Chicago Transit Board.

 There is no merit in plaintiff's contention that the ordinance is invalid because no public hearing with respect thereto was held by the Board before passage of the ordinance. We have examined the Chicago Ordinance and in our opinion the provision for public hearing had application to those extensions within the City of Chicago where rights had not been specifically granted under the ordinance. The Chicago ordinance does grant to the Chicago Transit Authority rights to the east half of Austin boulevard and the City of Chicago has no authority with respect to the west half.

If on final hearing it should appear that the use of the extension for local transportation is something more than incidental to the interurban character of the line, the court can by proper order, as counsel for defendants suggest, restrict local transportation use within reasonable bounds.

We have examined other points advanced by plaintiff and are of the opinion they provide no support for the injunction order. The order is hereby reversed, and the cause remanded with directions to dissolve the temporary injunction and for such further proceedings as are not inconsistent with the views herein expressed.

*Order reversed and cause remanded with directions.*
Tuohy, P. J. and Robson, J., concur.